277 N.J. Super. 22 (1994)
648 A.2d 1139
BARBARA CHALEF, PLAINTIFF-APPELLANT,
v.
JOHN L. RYERSON, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 20, 1994.
Decided October 21, 1994.
*25 Before Judges MICHELS, KEEFE and HUMPHREYS.
Brian E. Ansell argued the cause for appellant (Ansell, Zaro, Bennett & Grimm, attorneys; Richard B. Ansell, of counsel; Stephanie H. Hodach, on the brief).
Lawrence T. Quirk, III argued the cause for respondent (Campbell, Foley, Lee Murphy & Cernigliaro, attorneys; Mr. Quirk, III, of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
Plaintiff Barbara Chalef appeals from a summary judgment of the Law Division that dismissed her personal injury tort action against defendant John L. Ryerson to recover non-economic losses she sustained as a result of an automobile accident. More precisely, plaintiff appeals from two orders. The trial court's first order granted defendant's motion for summary judgment when it found that plaintiff's automobile was principally garaged in New Jersey on the date of the accident, thereby subjecting her to the verbal threshold requirements of N.J.S.A. 39:6A-8(a) of the New Jersey Automobile Reparation Reform Act codified under N.J.S.A. 39:6A-1 et seq. (commonly referred to as our No-Fault Law). The second order granted summary judgment in favor of defendant and dismissed plaintiff's action on the ground that she failed to satisfy the verbal threshold requirements of the no-fault law.

*26 I.
The initial question presented is whether, under our system of compulsory automobile insurance, plaintiff's automobile was "principally garaged" pursuant to our No-Fault Law at the time of the accident. We are satisfied from our review of the record and the arguments presented that the trial court properly held that plaintiff's automobile was principally garaged in New Jersey, thereby subjecting her to the verbal threshold requirements of our No-Fault Law.
Pursuant to N.J.S.A. 39:6A-3 of our No-Fault Law, "[e]very owner or registered owner of an automobile registered or principally garaged in this State shall maintain automobile liability insurance coverage, under provisions approved by the Commissioner of Insurance." (Emphasis added). See also N.J.S.A. 39:6B-1 and N.J.S.A. 39:6B-2. In addition, every automobile liability insurance policy insuring an automobile in this state must provide personal injury protection (PIP) coverage, as set forth in N.J.S.A. 39:6A-4. And, "[a]ny person who, at the time of an automobile accident resulting in injuries to that person, is required but fails to maintain" the PIP coverage mandated by N.J.S.A. 39:6A-4 is automatically subjected to the verbal threshold tort option specified in N.J.S.A. 39:6A-8(a). See also N.J.S.A. 39:6A-4.5.
The Supreme Court, in Sotomayor v. Vasquez, 109 N.J. 258, 261, 536 A.2d 746 (1988), elaborated on the purposes behind our system of compulsory automobile insurance providing basic PIP coverage as follows:
[C]ompulsory automobile insurance providing basic PIP benefits for the occupants of each car and the members of each car owner's family is designed to provide quick and easy reimbursement for the basic personal costs most people incur when they are involved in an automobile accident. Usually, the benefits payable under PIP law are the familiar common-law special damages for "bodily injury," such as medical expenses and lost income. PIP's strategic goal is to counter, by early payment of bills without regard to a driver's fault, the increasing spiral of automobile negligence cases that were thought to have been a major cause of rising auto insurance premiums in New Jersey, as well as much of the congestion in the court system.

*27 Expressed symbolically, the basic scheme of PIP is that each car in personal use should take care of its passengers and that each family car should take care of that family.
The term "principally garaged," as used in N.J.S.A. 39:6A-3, is not defined by statute. Therefore, it should be given its ordinary and well understood meaning, consistent with the Legislature's intent in enacting our current system of compulsory automobile insurance providing basic PIP coverage. See State v. Arslanouk, 167 N.J. Super. 387, 393, 400 A.2d 1206 (App.Div. 1979). We construe the term "principally garaged" to mean the physical location where an automobile is primarily or chiefly kept or where it is kept most of the time. See Frasca v. United States, 702 F. Supp. 715, 718 (C.D.Ill. 1989).
Analyzed in this light, the trial court correctly concluded that plaintiff's vehicle was principally garaged in New Jersey on August 23, 1991. The facts lending to this determination were essentially uncontroverted. Plaintiff had lived exclusively in Middletown, New Jersey for approximately four months prior to the accident. Plaintiff first began working as a systems engineer at AT & T Bell Laboratories in Holmdel, New Jersey, in April 1990, approximately one year and four months prior to the accident. While plaintiff was temporarily relocated between New Jersey, Maryland, Washington, D.C., North Carolina and Virginia, from April 1990 until April 1991, she apparently continued to maintain her address in Middletown. Furthermore, while plaintiff claims that she intended to return to Maryland and had several job interviews there, she still resided in New Jersey.
Following the August 23, 1991 accident and during her recuperation, plaintiff continued to reside in Middletown, New Jersey. Upon her return to work in November 1991, plaintiff remained in New Jersey and began permanently working at AT & T in Holmdel. Sometime thereafter, plaintiff changed her legal residency and motor vehicle licensure from Maryland to New Jersey. In July 1992, plaintiff moved from Middletown to Lincroft, New Jersey, where she presently resides.
*28 Plaintiff argues that her intent should be the controlling factor in determining whether her automobile was principally garaged within New Jersey for purposes of our No-Fault Law. Specifically, she claims that she was only on temporary assignment in New Jersey at the time of the accident and that she did not intend to remain in New Jersey. Therefore, she contends that her automobile should not be considered as having been principally garaged within New Jersey. We disagree. While intent may be relevant for determining where an automobile is principally garaged in some circumstances, such as where a person is merely visiting for a short period of time, (see, for example, State v. Arslanouk, supra), the physical location where the automobile is primarily kept is the pivotal factor in determining where the automobile is principally garaged. Here, plaintiff lived and worked in New Jersey for four consecutive months prior to and at the time of the accident. Plaintiff maintained her address in New Jersey even while on temporary assignment out of New Jersey. In addition, plaintiff remained in New Jersey following the accident, and works and resides in New Jersey today. These factors clearly rebut plaintiff's claim that her automobile was not "principally garaged" in New Jersey at the time of the accident. As the trial court so appropriately observed: "[I]t is not the intention of the owner or the registered owner of the automobile as to where it should be principally garaged, it's a physical fact as to where it is principally garaged."
Consequently, the trial court properly held that plaintiff's automobile was "principally garaged" in New Jersey at the time of the accident, and that, therefore, plaintiff was subject to the verbal threshold requirements of N.J.S.A. 39:6A-8(a).

II.
On appeal, plaintiff contends for the first time that the law of Maryland should apply since that was the place of her insurance contract. Since plaintiff did not raise this issue in the trial court, we decline to consider it now on appeal. "It is a well-settled *29 principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available `unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Skripek v. Bergamo, 200 N.J. Super. 620, 629, 491 A.2d 1336 (App.Div.), certif. denied, 102 N.J. 303, 508 A.2d 189 (1985) (quoting Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973)); see also State v. Bogus, 223 N.J. Super. 409, 419, 538 A.2d 1278 (App.Div.), certif. denied, 111 N.J. 567, 546 A.2d 497 (1988).
Even if we ignored this sound principle of appellate review and considered the merits of plaintiff's contention, the interests of New Jersey in this case dictate that its laws apply. In Buzzone v. Hartford Accident and Indemnity Co., 23 N.J. 447, 129 A.2d 561 (1957), the Supreme Court ruled that "the rights and liabilities of the insurer under the policy and the statutory impact thereon are to be determined by the law of the state where the contract was made." Id. at 452, 129 A.2d 561. Then, in State Farm, etc., Ins. Co. v. Simmons' Estate, 84 N.J. 28, 36, 417 A.2d 488 (1980), the Court refined this rule, commenting that "[c]ases in this jurisdiction subsequent to Buzzone have not mechanically or inflexibly applied the lex loci contractus rule." On the contrary, the Court stated:
[O]ur courts have generally acknowledged, in the selection of state law, the relevance of respective state interests in the particular resolution of the controversy measured by several factors including the connection of the parties to the respective states, the nature of pertinent events that have transpired within each state, and the character of each state's policy preferences relevant to the particular litigation.
[Ibid.].
The Court then concluded:
[T]he proper approach in resolving conflict-of-law issues in liability insurance contract controversies is that which may be synthesized from this post-Buzzone evolution of the law in both the contract field as well as in the somewhat related tort field, particularly in the area of automobile accident litigation. This calls for recognition of the rule that the law of the place of the contract ordinarily governs the choice of law because this rule will generally comport with the reasonable expectations of the parties concerning the principal situs of the insured risk during *30 the term of the policy and will furnish needed certainty and consistency in the selection of the applicable law. See Buzzone v. Hartford Accident & Indemnity Co., supra, 23 N.J. at 458 [129 A.2d 561], Mayer v. Roche, 77 N.J.L. 681, 683 [75 A. 235] (E. & A. 1909); A. Ehrenzweig, A Treatise on the Conflict of Laws § 174 at 460-461 (1962); R. Leflar, American Conflicts of Law § 86 at 173 (3 ed. 1977); Restatement, supra, § 193. At the same time, this choice-of-law rule should not be given controlling or dispositive effect. It should not be applied without a full comparison of the significant relationship of each state with the parties and the transaction. That assessment should encompass an evaluation of important state contacts as well as a consideration of the state policies affected by, and governmental interest in, the outcome of the controversy.
While this approach is necessarily broad and flexible, we find it to be appropriate in this case. It best serves and accommodates the diverse, important considerations which must be duly weighed in settling conflicts of law in litigation such as this. We thus hold that, in an action involving the interpretation of an automobile liability insurance contract, the law of the place of the contract will govern the determination of the rights and liabilities of the parties under the insurance policy. This rule is to be applied unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield.

[Id. at 37 (emphasis added)].
Application of these principles dictate that New Jersey law should apply to this case. Our Legislature has expressed a clear intent that automobiles principally garaged in this state maintain the PIP coverage mandated by N.J.S.A. 39:6A-4. See N.J.S.A. 39:6A-3; N.J.S.A. 39:6A-4.5 and N.J.S.A. 39:6B-1. PIP coverage is an integral part of our No-Fault Law. See Sotomayor v. Vasquez, supra, 109 N.J. at 261, 536 A.2d 746. New Jersey certainly "has a legitimate interest in its insurance scheme." Adams v. Keystone Ins. Co., 264 N.J. Super. 367, 377, 624 A.2d 1008 (App.Div. 1993).
Furthermore, the accident occurred in New Jersey, and both parties to this litigation resided here. The only interest Maryland has in this case is that it was the place of the insurance contract. That New Jersey law should be applied in this case is strongly supported by the specific language of State Farm, etc., Ins. Co. v. Simmons' Estate, supra, in which the Court expressly stated:
There are many expressions of state public policy. Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 98 [415 A.2d 1156] (1980). We look first to legislation as a source of the state's interest in this matter. This Court in Buzzone observed that if New Jersey chose through legislation to apply its standards as to scope of *31 coverage for insurance policies to out-of-state insurance companies which insure out-of-state motorists, New Jersey courts would follow that directive even when the law of other jurisdictions dictated a contrary result.
[84 N.J. at 39, 417 A.2d 488].
Plaintiff also contends that it would be inequitable for her to "suffer the detriment of restrictive Maryland No Fault benefits together with the detriment of the New Jersey verbal threshold law." We disagree. Plaintiff has not yet exhausted the PIP benefits under her insurance policy issued by Erie. Under that policy, she is entitled to $2,500 in PIP benefits and an additional $10,000 in benefits because she was wearing a seatbelt. Erie has paid the initial $2,500 in PIP benefits and $4,303 into the extension of benefits. Plaintiff, therefore, has not yet suffered any inequitable harm.
In any event, our Legislature has clearly chosen to require out-of-state residents who "principally garage" their automobiles in New Jersey and who fail to maintain the minimum PIP coverage required by N.J.S.A. 39:6A-4 to satisfy the more restrictive verbal threshold requirements of N.J.S.A. 39:6A-8(a). See N.J.S.A. 39:6A-4.5; cf. N.J.S.A. 39:6A-7(b)(1). Plaintiff used and primarily kept her automobile in this state at the time of the accident and failed to insure that automobile pursuant to New Jersey law. Plaintiff, therefore, is subject to the more restrictive verbal threshold requirements in pursuing her claim for non-economic loss.

III.
We are satisfied that plaintiff failed to show by objective credible evidence that her injuries met the verbal threshold requirements of N.J.S.A. 39:6A-8(a). N.J.S.A. 39:6A-8.1 requires insurance consumers to elect between two types of coverage; a less expensive policy which limits the right to recovery for non-economic loss (N.J.S.A. 39:6A-8(a)), or a more expensive policy without such limitation of rights (N.J.S.A. 39:6A-8(b)). The less expensive option, N.J.S.A. 39:6A-8(a), commonly referred to as *32 the verbal threshold option, precludes a plaintiff from recovering for non-economic loss as a result of bodily injury arising out of an automobile accident unless that plaintiff sustained a personal injury falling within one of the categories of injuries specified within that statute. The nine categories of injuries enumerated in N.J.S.A. 39:6A-8(a) are:
(1) death; (2) dismemberment; (3) significant disfigurement; (4) a fracture; (5) loss of a fetus; (6) permanent loss of use of a body organ, member, function or system; (7) permanent consequential limitation of use of a body organ or member; (8) significant limitation of use of a body function or system; or (9) a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute that person's usual and customary daily activities for not less than 90 days during the 180 days immediately following the occurrence of the injury or impairment. (numeration supplied).
In Oswin v. Shaw, 129 N.J. 290, 609 A.2d 415 (1992), the Supreme Court held that the correct procedure for verbal threshold cases follows the summary judgment model. The trial court, therefore, must decide whether the alleged injury would, if believed by the fact-finder, meet the requirements of one of the verbal threshold categories listed in N.J.S.A. 39:6A-8(a). Id. at 294, 609 A.2d 415. See also Watkins v. Davis, 259 N.J. Super. 482, 493, 614 A.2d 189 (Law Div. 1992), aff'd, 268 N.J. Super. 211, 633 A.2d 112 (App.Div. 1993).
The trial court's verbal threshold determination consists of two questions: (1) whether the plaintiff's injuries fall within any of the nine categories of the statute, and (2) if so, whether the evidence "demonstrates a material dispute of fact regarding the nature and extent of the plaintiff's injuries." Oswin, 129 N.J. at 307, 609 A.2d 415. If the plaintiff's claims survive the above analysis, then resolution of the dispute is for the jury. Ibid. See also Watkins v. Davis, supra, 259 N.J. Super. at 494, 614 A.2d 189. The court, however, is to make the threshold determination when no disputed factual issues are present. Id. 129 N.J. at 310, 609 A.2d 415. See also Watkins v. Davis, supra, 259 N.J. Super. at 494, 614 A.2d 189.
*33 In order to survive a motion for summary judgment, the "plaintiff must show a material dispute of fact by credible, objective medical evidence." Oswin, 129 N.J. at 314, 609 A.2d 415 (citations omitted). Subjective complaints of pain unsupported by credible medical evidence will not suffice to create a factual dispute. Ibid. As the Court explained in Oswin:
We understand that one might view the "serious impact on plaintiff's life" test as somewhat subjective. To ensure uniform application of that test, we emphasize that plaintiffs must submit objective, credible evidence that could support a jury finding in his or her favor. We respect the abilities of medical professionals to ascertain the presence of a genuine, disabling injury, but we nevertheless are satisfied that the Legislature sought to guard against a finding of "serious injury" when plaintiff's proofs are based solely on subjective complaints of pain.
[Id. at 319, 609 A.2d 415].
See also Dyszel v. Marks, 6 F.3d 116, 129 (3d Cir.1993); Polk v. Daconceicao, 268 N.J. Super. 568, 575, 634 A.2d 135 (App.Div. 1993); Phillips v. Phillips, 267 N.J. Super. 305, 318, 631 A.2d 564 (App.Div. 1993); Watkins v. Davis, supra, 259 N.J. Super. at 493, 614 A.2d 189.
To recover under the verbal threshold statute, "a plaintiff must show a nexus between the injury and the disability." Oswin, 129 N.J. at 318, 609 A.2d 415. The injury by itself does not fulfill the statutory requirement. Ibid. Stated otherwise, a plaintiff must show that "the injury had a serious impact on the plaintiff and her life." Ibid. (quoting Oswin v. Shaw, 250 N.J. Super. 461, 470, 595 A.2d 522 (App.Div. 1991)). See also Polk v. Daconceicao, supra, 268 N.J. Super. at 575, 634 A.2d 135; Phillips v. Phillips, supra, 267 N.J. Super. at 318-19, 631 A.2d 564. Subjective complaints unsupported by credible medical evidence are insufficient to establish the requisite nexus. Oswin, 129 N.J. at 318, 609 A.2d 415 (quoting Dwyer v. Tracey, 105 A.D.2d 476, 480 N.Y.S.2d 781, 783 (App.Div. 1984)).
Nevertheless, the Oswin court pointed out that a "soft tissue" injury may be compensable under the verbal threshold scheme if "objective proof of such injury and consequent disability" are shown. Id. at 319-20, 609 A.2d 415. The Court noted that most range of motion tests, which are ordinarily based on a patient's *34 pain responses, "will not suffice unless the restricted mobility is verified by physical examination and observation." Id. at 320, 609 A.2d 415. The Court found that, although plaintiff Oswin's treating physician's report was "admirably specific in showing the degrees of limitation in six different types of movement, ... range-of-motion tests are not enough." Id.
In defining the word "significant" as used in the verbal threshold statute pertaining to "limitation of use of a body function or system," the Court used the standard set forth by the New York Court of Appeals in Licari v. Elliott, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 573, 441 N.E.2d 1088, 1091 (1982). In that case, the court stated that "the word `significant' ... should be construed to mean something more than a minor limitation of use. We believe that a minor, mild or slight limitation of use should be classified as insignificant within the meaning of the statute." Id.
Furthermore, with regard to the "permanency" requirements of the verbal threshold statute, the Oswin court stated that "mere repetition of the word `permanent' in the affidavit is insufficient to establish a `serious injury', and ... summary judgment should be granted for defendant where the plaintiff's evidence is limited to conclusory assertions tailored to meet statutory requirements." Id. at 317, 609 A.2d 415 (quoting Lopez v. Senatore, 65 N.Y.2d 1017, 494 N.Y.S.2d 101, 102, 484 N.E.2d 130, 131 (1985)). A medical doctor's mere parroting or paraphrasing of the threshold statute is not enough to meet the test. Id. at 320, 609 A.2d 415; see also Phillips v. Phillips, supra, 267 N.J. Super. at 318, 631 A.2d 564. In addition, the Court indicated that a plaintiff cannot demonstrate permanency through "a mere six months of [conservative] treatment." Oswin v. Shaw, supra, 129 N.J. at 320, 609 A.2d 415.
Application of these principles compels the conclusion that plaintiff has not shown by objective, credible evidence that her injuries fall within one of the legislatively prescribed categories enumerated in N.J.S.A. 39:6A-8(a). X-rays taken of plaintiff's cervical spine taken at the hospital about eight hours after the *35 accident were normal except for "straightening of the normal cervical lordosis consistent with cervical spasm." After a complete physical examination at the hospital conducted by Dr. Rajendra K. Sharma, plaintiff was diagnosed as suffering from a sprain and strain of the cervical spine. Plaintiff was discharged that same day.
Plaintiff's primary treating physician, Dr. James Spiro, saw plaintiff a total of twelve times over a span of about six months, from August 30, 1991 to February 25, 1992. Dr. Spiro's initial examination revealed motion to the cervical area limited by twenty-five percent. He noted tenderness present from the C5 to C7 spinal levels together with tightness and tenderness about the left trapezius and left posterior parascapular musculature. After reviewing the x-rays taken at the hospital, Dr. Spiro suspected an avulsion type fracture and sent plaintiff for a bone scan. The scan came back negative, indicating no fracture about the axial skeleton.
By plaintiff's second visit with Dr. Spiro on September 11, 1991, not even one month after the accident, he reported range of motion in the cervical spine to be "rather full." He also reported tightness and tenderness about the left trapezius, left scapulae muscle, and the upper rhomboids. Dr. Spiro prescribed a muscle relaxant and physical therapy. Plaintiff's physical therapist, Janice L. Volk, noted muscle spasm to plaintiff's upper trapezius, levator scapulae and cervical paraspinal muscles as well as limited range of motion in the cervical area.
By October 1, 1991, a little more than a month after the accident, Dr. Spiro found no paracervical muscle spasm, tightness or inflammation and reported a negative neurological examination. Because of plaintiff's persistent cervical sprain syndrome, Dr. Spiro instructed her to continue physical therapy, but felt that she no longer needed medication. By October 23, 1991, Dr. Spiro reported that plaintiff's orthopedic condition had "significantly improved" and felt that she could return to work.
*36 On December 3, 1991, plaintiff told Dr. Spiro she was doing well, but was experiencing increased tightness around her neck and right shoulder as well as pain radiating into her right elbow. Neurological examinations continued to be negative, but Dr. Spiro felt plaintiff should stay in physical therapy. On January 20, 1992, plaintiff complained of recurrence of discomfort around the left shoulder with radiating pain into her wrist. Dr. Spiro reported a trigger point about the left elevator scapulae muscle with a full pain free range of motion to the cervical spine. As a result of plaintiff's persistent complaints, Dr. Spiro sent her for an MRI and electrodiagnostic studies. The MRI revealed mild degenerative changes with minimal ridging at C5, C6 and C6, C7. The electrodiagnostic studies were essentially negative.
Dr. Spiro last saw plaintiff on February 25, 1992, only about six months after the accident, and stated that plaintiff claimed she suffered from some tightness and tolerable discomfort around her neck and shoulder after a full day of work. Plaintiff denied any "radiating pain or paresthesias into the left upper extremity." Dr. Spiro noted a trigger point to be present about the left elevator scapulae muscle and found motion to the cervical spine to be full and pain free. Based upon his last examination of plaintiff Dr. Spiro concluded:
I felt patient's orthopedic condition had stabilized and plateaued. It was my feeling her present symptoms would resolve with time and patience. Patient was discharged to return if acute problems arose.
In summary patient was under my care from August 30, 1991 to February 25, 1992. In my opinion the motor vehicle accident gave rise to acute cervical and parascapular sprain syndrome as well as an intermittent scapulocostal syndrome with referred pain. Fortunately these soft tissue injuries responded to conservative treatment.
I feel the degenerative changes noted by plain radiographs and MRI represented a premorbid situation.
Obviously her difficulties were directly related to her involvement in the motor vehicle accident. From an objective point of view I do not anticipate any disability either permanent, partial, or whole, however, subjectively patient may have intermittent musculoskeletal symptoms over the next six to twelve months. Patient appears well motivated and eager to return to her premorbid state. If she is conscientious regarding a home exercise program I feel she should do quite well.
*37 Plaintiff was also examined by Dr. Paul Gilson, who diagnosed her as suffering from (1) resolving cervical syndrome; (2) rule out left ulnar neuropathy; (3) left trapezial myofascitis; and (4) history of low back pain. He did not find spasm in the cervical area and reported full range of motion. He found a positive Tinel's sign with regard to the left elbow.
Plaintiff's last examination was performed by Dr. M. Leonard Genova. Dr. Genova reported normal range of motion and found no evidence of muscle spasm. Dr. Genova noted plaintiff's complaints but found no physical findings of injury. He concluded: "My physical examination, at this time, shows no evidence of any residual of trauma. There certainly is no need for treatment and the prognosis is excellent."
We agree with the trial court that the doctors' reports do not provide sufficient objective, credible evidence that would enable plaintiff to overcome the verbal threshold. Dr. Spiro's limited range of motion test results with regard to plaintiff are not enough to satisfy the requirements of the statute. See Oswin, supra, 129 N.J. at 320, 609 A.2d 415. Moreover, much of her doctor's diagnosis was based upon plaintiff's complaints of pain. These subjective complaints will not suffice to satisfy the requirements of the statute.
Plaintiff's physical therapist and her initial X-ray report revealed spasm in her cervical area. While spasm is an objective form of evidence, these findings of spasm were not sufficiently connected to any "permanent loss of use," "permanent consequential limitation of use," or "significant limitation of use." See Oswin, supra, 129 N.J. at 320, 609 A.2d 415; see also Dyszel v. Marks, supra, 6 F.3d at 130 ("mere mention of the word `spasm' ... cannot by itself defeat a summary judgment motion."). Furthermore, plaintiff's own primary treating physician, who she saw for six months following the accident, and Drs. Gilson and Genova did not report any spasm.
Plaintiff's complaints that her lifestyle has been significantly impaired since the accident do not suffice to satisfy the requirements *38 of N.J.S.A. 39:6A-8(a). Plaintiff missed work from the date of the accident until November 3, 1991. Plaintiff claims that she suffers pain during periods of prolonged sitting or standing. During work meetings, she is forced to get up and walk around. At times, plaintiff maintains that the pain becomes so intense that she must exercise during these meetings. She spends a significant portion of her work day in a seated position and must use an orthopaedic chair while at work. Plaintiff also claims that since the date of the accident, she has been unable to go horseback riding, which she had done once a week, or ski, which she had done about two to three times per season. Plaintiff doubts that she will be able to go skiing this upcoming season.
Plaintiff's complaints in this regard, however, are not sufficient to establish "permanent loss of use," "permanent consequential limitation of use," or "significant limitation of use" within the meaning of N.J.S.A. 39:6A-8(a). Plaintiff's own primary treating physician, Dr. Spiro, also opined that "[f]rom an objective point of view I do not anticipate any disability either permanent, partial, or whole, however, subjectively patient may have intermittent musculoskeletal symptoms over the next six to twelve months." Plaintiff's subjective complaints unsupported by credible objective medical evidence will not suffice to create a factual dispute. Oswin, supra, 129 N.J. at 314, 609 A.2d 415.
Dr. Spiro also reported full range of motion in plaintiff's cervical area within one month after the accident. The limitations on plaintiff's range of motion, which have improved since the accident, do not establish that her life has been significantly or seriously impacted within the contemplation of the verbal threshold statute. See Phillips v. Phillips, supra, 267 N.J. Super. at 318, 631 A.2d 564.
This case is distinguishable from some of our recent decisions in which plaintiffs were found to have created a factual dispute under the No-Fault Law. For example, in Dabal v. Sodora, 260 N.J. Super. 397, 401, 616 A.2d 1297 (App.Div. 1992), we found "that plaintiff ha[d] raised at least an arguable issue respecting the *39 objective criterion in view of the expert findings of bulging disks and significant limitation of motion prominent among the general panoply of objective findings." Similarly, in Arencibia v. Rosas, 270 N.J. Super. 339, 348, 637 A.2d 205 (App.Div. 1994), we held that the trial court erred in granting defendant's motion for summary judgment under the verbal threshold statute where plaintiff's doctors had reported spasm of the cervical, thoracic, and lumbosacral sections of the spine, and X-rays taken of plaintiff had revealed "reduction of the neutral lateral curves" and "marked subluxation with sprain." Furthermore, in that case plaintiff's "EMG and NCV of the left upper limb and retrocollic area were abnormal indicating a radiculopathy with involvement of posterior rami." Ibid.
Likewise, in Cineas v. Mammone, 270 N.J. Super. 200, 636 A.2d 1071 (App.Div. 1994), the trial judge initially denied defendant's motion for summary judgment based upon the verbal threshold. Subsequently, another trial judge granted a renewed motion by defendant for summary judgment also based upon the verbal threshold. We reversed, holding that plaintiff had submitted sufficient credible, objective evidence to carry him across the verbal threshold. We explained that plaintiff's principal treating physician reported that plaintiff's cervical spinal muscles "were in severe spasm" and that his lumbosacral spinal muscles "were in spasm." Id. at 211, 636 A.2d 1071. In addition, we noted that even defendant's physician verified that plaintiff had restricted range of motion and that plaintiff was "completely unable to walk on his heels." Ibid; see also Cavanaugh v. Morris, 273 N.J. Super. 38, 41, 640 A.2d 1192 (App.Div. 1994) ("report of continuing spasm long after the accident [more than a year] meets Oswin's objective medical-evidence requirement"); Moreno v. Greenfield, 272 N.J. Super. 456, 466, 640 A.2d 335 (App.Div. 1994) (noting that disc pathology in MRI report "strongly corroborates the objective necessity for the curtailment of plaintiff's activities"); Owens v. Kessler, 272 N.J. Super. 225, 232, 639 A.2d 738 (App.Div. 1994) (holding that "[s]pasm ... still evident ... twenty-six months *40 after cessation of active medical treatment, clearly constitutes prima facie objective evidence of permanent injury").
By contrast, plaintiff's injuries in this case are not as serious as those that the Supreme Court found insufficient to create a factual dispute in Oswin, let alone those cases mentioned above. The findings in the chiropractor's report in Oswin are even more serious than that of plaintiff's primary treating physician, and plaintiff has failed to produce evidence that would warrant a result different than Oswin. Consequently, the trial court properly held that plaintiff had failed to prove by objective credible evidence that she sustained a compensable injury within the meaning of our No-Fault Law.

IV.
Accordingly, the summary judgment under review is affirmed.